UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MONACO INDUSTRIES, LLC,                )
                                       )
                Plaintiff,             )
                                       )
v.                                     )       No. 3:22-CV-459-JRG-DCP
                                       )
FOMENTO ECONOMIC MEXICANO              )
S.A.B. de C.V., d/b/a FEMSA, et al.,   )
                                       )
                Defendants.            )

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 20] of referral by United States District Judge J. Ronnie Greer.[1]

Now before the Court is Defendants' Consolidated Motions to Dismiss [Doc. 12]. Plaintiff has responded in opposition [Doc. 22], and Defendants filed a reply [Doc. 23]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion [**Doc. 12**].

I.      **BACKGROUND**

Plaintiff originally filed this case in the Chancery Court for Knox County, Tennessee, and Defendants removed this action on December 22, 2022 [Doc. 1]. Plaintiff names the following entities as Defendants: Fomento Economico Mexicano S.A.B. de C.V. d/b/a FEMSA ("FEMSA"), Envoy Solutions, LLC ("Envoy"), Southeastern Paper Group, LLC ("Southeastern"), and Penn

---

[1]     The parties requested that the undersigned resolve this motion pursuant to Local Rule 7.5, which provides that the parties "may consent to the final resolution and entry of judgment on the dispositive motion by a magistrate judge." E.D. Tenn. L.R. 7.5(a). Upon receiving the parties' request, Judge Greer entered an Order, referring the motion to the undersigned "for final resolution and entry of judgment" [Doc. 20].

Jersey Paper Company, LLC ("Penn Jersey") [Doc. 1-1]. FEMSA is the parent company for Envoy, and Envoy is the parent company of Southeastern and Penn Jersey [*Id*. ¶¶ 2–3].[2] Plaintiff manufacturers, purchases, and sells paper, paper products, and supplies throughout Tennessee and the United States, and Defendants are in the business of distributing supplies [*Id*. ¶¶ 10, 12, and 13].[3]

According to the Complaint, Plaintiff and "Defendant Southeastern enjoyed a long-standing business relationship that spanned nearly fifteen (15) years, beginning in 2008 and continuing through 2022" [*Id*. ¶ 14]. In their course of dealing, Southeastern sent purchase orders to Plaintiff, and Plaintiff fulfilled those orders [*Id*. ¶ 17]. Envoy acquired Southeastern in late 2020 or early 2021, and despite the acquisition, there was no disruption in the parties' business relationship [*Id*. ¶ 18].

On March 15, 2022, Douglas Bobar ("Bobar"), previously the Director of Purchasing for Southeastern and now for Envoy, emailed Richard Jansen ("Jansen"), Plaintiff's president, explaining that FEMSA had acquired Envoy, Southeastern, and others in order to create a "national distribution platform" [*Id*. ¶ 21 (citing Doc. 1-1 p. 46)].[4] Bobar stated, "I have been tasked to engage suppliers and come up with an Envoy program for all members and drive sales to fewer partnered suppliers. This is my category so I will be asking Monaco for a new program" [*Id*. (citing Doc. 1-1 p. 46)]. He also asked if Plaintiff extended the program from 4/30/2021 to go

---

[2]     Envoy acquired Southeastern in late 2020 or early 2021 and acquired Penn Jersey in November 2021 [Doc. 1-1 ¶¶ 18, 19].

[3]     Plaintiff alleges that "FEMSA is a multi-faceted corporation with ownership interests in entities such as The Coca-Cola Company and Heinekin . . ." [Doc. 1-1 ¶ 11].

[4]     Along with other exhibits, Plaintiff attached various email exchanges to its Complaint [*See* Doc. 1-1 pp. 45–131]. In summarizing the facts, the Court has provided citations to the Complaint and the emails, although the undersigned has relied on the emails when directly quoting therefrom. In addition, the Court has not corrected any grammatical errors in the emails.

2

through 4/30/2022, and if so, to provide a copy of it [*Id*. ¶ 22 (citing Doc. 1-1 p. 46)]. He concluded, "I have a really nice value proposition to share with you" [*Id*. (Doc. 1-1 p. 46)]. Jansen sent Bobar a copy of the requested program the same day and noted his availability to discuss the other matters [*Id*. ¶ 23 (citing Doc. 1-1 p. 46)].

On March 28, 2022, Jansen and Bobar confirmed a meeting [*Id*. ¶ 24 (citing Doc. 1-1 p. 49)]. Bobar stated that he would review FEMSA's strategy to establish a national distributors platform and noted the "need to create one Envoy program and create true value for our partnered vendors" [*Id*. (citing Doc. 1-1 p. 49)]. According to the Complaint, during the meeting, via Microsoft Teams, Jansen and Bobar "discussed the acquisition of Defendants Southeastern and Penn Jersey by Defendant FEMSA" [*Id*. ¶ 25]. In addition, during the meeting, "Bobar stated that he wanted Plaintiff Monaco to become the vendor for Defendant Envoy and extolled the possibilities of a growing opportunity for Plaintiff" [*Id*.].

On April 19, 2022, Bobar sent an email to Janson "explaining Defendants' intent with respect to the creation of one pricing program for all of Defendants' members, including Defendant Penn Jersey and Defendant Southeastern" [*Id*.]. Bobar wrote:

> Our objective is to put together a 2022 program for all of Envoy Solutions members. Please keep the inclusion open as we acquire and add new members. Currently the volume is only from Penn Jersey Paper and Southeastern Paper Group. We are looking for two things: One program for all members and one price list for all members. Please be aggressive as you can as the are several suppliers involved in this opportunity. The volume attached is annual for 2021. We can move this business and we will move this business to the supplier that wants to partner with Envoy and growth their business together. We will not support any other non partnered suppliers unless it is contracted business that we cannot move. I did include one ribbon on the summary. If you can provide that please match it up with your offering and add it to the price list and program.

\* \* \*

> I will be your contact for all of Envoy. No getting redirected to other purchasing folks. We will make the decision and support partnered vendor. We are inpowered to make these decisions and implement the change. I am excited about the relationship and the opportunity to really focus on this category and grow together. Please right the program to Tom Furia III.

[Doc. 1-1 p. 50].

Plaintiff alleges that "beginning in March 2022 and continuing through July 2022, in addition to its usual purchase orders received from representatives of Defendant Southeastern, [it] also received purchase orders from representatives of Defendant Envoy" [Doc. 1-1 ¶ 26]. While the parties' continued their business relationships, Plaintiff alleges that "Jansen and . . . Bobar worked together to create a program for Defendants that would expand the business from Defendant Southeastern to Defendants Envoy and Penn Jersey, ultimately benefitting Defendant FEMSA" [*Id.* ¶ 27].

On April 27, 2022, Jansen emailed Bobar, "telling him that Plaintiff was working on Defendant Penn Jersey's portion of the new program solicited by Defendants and asking for additional information and specifications regarding Defendant Penn Jersey's needs as to its register roll/thermal roll program" [*Id.* ¶ 28 (citing Doc. 1-1 p. 55)]. Bobar forwarded this email to Thomas Furia, III ("Furia"), the Director of Supply Chain Management at Penn Jersey [*Id.* (citing Doc. 1-1 p. 54)]. Furia responded by answering Jansen's questions [*Id.* ¶ 29 (citing Doc. 1-1 p. 55)]. On May 2, 2022, Bobar sent Jansen an email, stating that he was "[r]eally looking for one program for all of Envoy and one price list for all of Envoy. You can quote us LTL pricing as well as TL and the location will decide their purchasing minimum and pay the price accordingly. So one LTL and TL price for all, one Envoy price list. You have several brackets if needed." [*Id.* ¶ 30 (citing Doc. 1-1 p. 53)].

On May 4, 2022, Jansen sent Bobar an email "with an attachment containing a proposed program for Defendants" [*Id*. ¶ 31 (citing Doc. 1-1 p. 58)]. Jansen wrote, "The program consists of the monthly 5% merchandise credit and 2% 10-day prompt payment terms" [*Id*. (citing Doc. 1-1 p. 58)]. He also noted that while Bobar requested a single price, "the freight to Defendant Penn Jersey would have affected this component for location maintained by Defendant Southeastern" [*Id*. ¶ 32 (citing Doc. 1-1 p. 58)]. Following this email, Jansen and Bobar continued to exchange emails wherein Jansen checked the progress of Bobar's review, Bobar asked pricing questions, and Plaintiff updated the spreadsheets for Defendants' pricing as requested [*Id*. ¶¶ 32–33].

Throughout May 2022 to July 2022, the parties continued to engage in discussions regarding price adjustments [*Id*. ¶¶ 34–39]. On July 19, 2022, Bobar emailed Jansen and Stacey Anderson ("Anderson"), Plaintiff's Chief Financial Officer [*see* Doc. 1-1 p. 75], as follows:

> We are prepared to award the register roll business to Monaco for all of Envoy Solutions. I just need a few things in order to get that done.
>
> ***
>
> We are prepared to move forward with Monaco. My suggestion to my boss Tom Furia III. He is ready to move if you could address the issues in the prior paragraph. Please let me know this week if you can. We can then speak about next steps and the timing of the conversion. We will need to move Iconex business in both the North and the South. His only other concern was your support of the PJP business to provide uninterrupted service to the best of your ability.

[*Id*. ¶ 40 (citing Doc. 1-1 p. 108)]. A few days later, Jansen sent a letter to Bobar, dated July 21, 2022, as follows:

> Monaco is pleased to offer this program to Envoy Solutions members from August 1, 2022 to July 31, 2023.
>
> Monaco's program for Envoy Solution includes a 6% rebate in the form of a merchandise credit issued at the end of each month. In addition, payment terms are 2% 10; net 30 days. The program will be in effect from August 1, 2022 to July 31, 2023.

5

[*Id*. ¶ 41 (citing Doc. 1-1 p. 112)].  On July 25, 2022, Bobar emailed Jansen that he was "checking on the critical item pricing adjustment[,]"explaining that certain prices "will close the deal and [they] can move forward" [*Id*. ¶ 42 (citing Doc. 1-1 p. 116)].  Bobar concluded by requesting one price revision and noted, "Please let me know if you can make this adjustment and I will commit to giving you all the business today" [*Id*. (citing Doc. 1-1 p. 116)].  Jansen responded the same day, "[L]ets move forward with your proposal" [*Id*. ¶ 43 (citing Doc. 1-1 p. 116)].  And a few minutes later, Bobar responded, "I think this is going to be a great relationship.  I think we will be committed to giving this category attention to really growing the business" [*Id*. ¶ 44 (citing Doc. 1-1 p. 115)].  He also requested a revised price list, stated his availability to meet "to discuss moving forward and placing orders[,]" and noted his excitement "to get things going" [*Id*. (citing Doc. 1-1 p. 115)].

The parties continued to engage in back-and-forth emails regarding adjustments to the pricing columns [*Id*. ¶ 45].  On July 26, 2022, Bobar asked Anderson via email a pricing question and noted that Southeastern was going to move its Iconex volume and place orders next week, that Penn Jersey could not commit until "all is set up and ready to go[,]" and that Bobar was going to announce "this" to the sales teams on August 1, 2022 [*Id*. ¶ 46 (citing Doc. 1.1 p. 124)].  Bobar stated, "We are very excited to move forward and really partner with [Plaintiff]" [*Id*. (citing Doc. 1.1 p. 124)].  Thereafter, the parties continued to engage in back-in-forth email exchanges regarding updating final quotes, pricing, anticipated date of orders, sourcing of particular products, Plaintiff's "spec sheets" so that Bobar could set up shipping information in Defendants' system, and requests for Plaintiff's certificate of insurance and W-9 [*Id*. ¶¶ 47–51, 54].  As a result of these email and information exchanges, Plaintiff added Penn Jersey to its insurance [*Id*. ¶ 52].  During August and September 2022, Southeastern sent purchase orders to Plaintiff "based on the new

6

pricing program created for the expanded business for Defendant Envoy and other Defendants" [*Id*. ¶ 57].  According to Plaintiff, "Defendants paid those invoices in accordance with the new pricing as agreed upon by the parties" [*Id*.].  The parties also engaged in email exchanges regarding detailed shipping information and product codes [*Id*. ¶¶ 59–61].

The Complaint further alleges:

> On or about August 12, 2022, Plaintiff's Jansen met virtually with Defendants' Furia and Bobar via Microsoft Teams.  The purpose of the meeting was for Defendants' Furia to meet with Plaintiff's Jansen face-to-face to discuss Plaintiff Monaco.  During that meeting, Defendants' Furia asked Plaintiff's Jansen how Plaintiff could beat Defendants' previous supplier's prices.  Plaintiff's Jansen told him that he, on behalf of Plaintiff, was making an investment and looked forward to growing the business.  Defendants' Furia also asked how Plaintiff would handle Defendants' expansion to other locations and Plaintiff's Jansen replied that Plaintiff already serviced (and continues to service) accounts nationally and had no service issues.  Defendants' Furia ended the call by stating that Plaintiff's program for servicing Defendants would move forward, that Defendant Southeastern's orders would continue, and that Plaintiff could anticipate orders from Defendant Penn Jersey beginning in September 2022.

[*Id*. ¶ 62].  From August through the beginning of September 2022, Plaintiff received nearly $75,000 net worth from purchase orders for Southeastern [*Id*. ¶ 65].  In reliance on the parties' agreement and Defendants' representation, Plaintiff purchased a 3-ply paper product in the amount of $11,300 in anticipation that Penn Jersey would begin its orders in September 2022 [*Id*. ¶ 71].  On September 13, 2022, however, Bobar called Plaintiff and told him that Furia made the decision that Iconex would be Defendants' exclusive supplier instead of Plaintiff [*Id*. ¶ 69].  Plaintiff alleges, "Based on Defendants' representations and Plaintiff's longstanding relationship and course of dealing with Defendant Southeastern, Plaintiff's expectation was that the parties' agreement had established a ten year or more relationship for the Plaintiff to be the Defendants' sole supplier" [*Id*. ¶ 73].

Based on the above allegations, Plaintiff alleges breach of contract, promissory fraud, intentional misrepresentation, and promissory estoppel [*Id.* ¶¶ 74–95]. Defendants now move to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

Defendants filed their motion pursuant to Rules 12(b)(2) for lack of personal jurisdiction over FEMSA and 12(b)(6) for failure to state a claim against FEMSA as well as the other Defendants. With respect to the former, "the plaintiff bears the burden of establishing the existence of personal jurisdiction." *G.C. ex rel. Conner v. Disney Destinations, LLC*, No. 3:12-CV-54, 2012 WL 1205637, at *1 (E.D. Tenn. Apr. 11, 2012) (citing *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)). The Court can determine the issue on the parties' submissions or allow limited discovery and proceed with an evidentiary hearing. *Id.* (citation omitted). When the Court relies on the parties' submissions, as opposed to holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdiction." *Id.* (quoting *Indah v. SEC*, 661 F.3d 914, 920 (6th Cir. 2011)). In this context, the Sixth Circuit Court of Appeals has characterized the plaintiff's burden as "relatively slight[]," *Air Prods.*, 503 F.3d at 536 (citation omitted), and "can be done merely through the complaint." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020) (citation omitted). "In that context, the court reviews the pleadings and other documentary evidence in the light most favorable to the plaintiff, without considering the defendant's controverting assertions." *Taco Mamacita, LLC v. Wilco Holdings, LLC*, No. 1:21-CV-62, 2022 WL 16542580, at *3 (E.D. Tenn. Oct. 29, 2022) (citation omitted), *appeal dismissed*, No. 22-6039, 2023 WL 2392871 (6th Cir. Jan. 27, 2023).

If the plaintiff makes a prima facie case, then the burden "shifts to the defendant, whose motion to dismiss must be properly supported with evidence." *Malone*, 965 F.3d at 504 (citation

omitted).  "Once the defendant has met its burden, it returns to the plaintiff, who may no longer 'stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction.'"  *Id.* (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)).

On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint.  *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007).  This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief.  *Thurman*, 484 F.3d at 859.  This factual matter must "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

## III.  ANALYSIS

Defendants argue that the Complaint suffers from several defects.  First, Defendants assert that FEMSA should be dismissed under Rule 12(b)(2) because personal jurisdiction does not exist in this case.  Second, Defendants assert that the claims against FEMSA fail under Rule 12(b)(6) because it did not engage in any of the conduct that forms the basis of the Complaint.  Third,

9

Defendants assert that Plaintiff has not adequately pleaded a breach of contract claim against them because its own Complaint shows that there was no writing establishing the existence of any ten-year sole supplier agreement. Fourth, in violation of Rule 9(b), Defendants argue that Plaintiff has not pleaded any false or misleading statements regarding past or present facts or with sufficient particularity to support its claims for intentional representation and promissory fraud. Fifth, Defendants argue that Plaintiff has not alleged with particularity any concrete promise on which it reasonably relied in support of its promissory estoppel claim.

For the reasons explained below, the Court finds that it does not have jurisdiction over FEMSA and therefore it will be dismissed from this lawsuit. The Court further finds that Plaintiff has not adequately pleaded its breach of contract claim or its claim for intentional misrepresentation, and those claims will also be dismissed. The Court will allow Plaintiff's claims for promissory fraud and promissory estoppel to proceed against the remaining Defendants.

### A. Claims Against FEMSA

As mentioned above, Defendants argue that personal jurisdiction does not exist against FEMSA. Defendants assert that "FEMSA is incorporated and has its principal place of business in Mexico" [Doc. 13 p. 7]. Defendants conclude that general jurisdiction does not exist. In addition, Defendants argue that FEMSA is not subject to specific jurisdiction in this case. According to Defendants, simply because FEMSA is a parent company does not mean it purposefully availed itself to Tennessee. Defendants further argue that "Tennessee and Sixth Circuit law is clear that parent corporations are not subject to specific jurisdiction based solely on the conduct of their subsidiaries" [*Id*. at 8 (citations omitted)]. Defendants argue that FEMSA is not the alter ego of the other Defendants and that the "only allegation to support its alter ego claim is . . . limited to bare and conclusory group pleading" [*Id*. at 9]. But "[e]ven if [Plaintiff] had

attempted to allege facts supporting its alter ego claim," Defendants contend that "it would not have been able to do so in good faith, because FEMSA and Envoy are indeed separate entities that operate in accordance with appropriate corporate practices" [*Id.*]. In support of Defendants' assertion, they filed the Declaration of Paul Ferracane, the Vice President of Category Management at Envoy [Doc. 13-1]. To the extent the Court finds personal jurisdiction exists, Defendants argue that Plaintiff fails to state a claim upon which relief can be granted against FEMSA.

Plaintiff responds that contrary to Defendants' argument, the "Complaint adequately makes claims against FEMSA and its involvement in the conduct of all Defendants relative to the negotiations with [it]" [Doc. 22-1 p. 7]. Referencing an email on March 15, 2022, Plaintiff argues that FEMSA was implicated when Bobar stated that it had acquired Envoy and Southeastern in order to create "a national platform." [*Id.* (citation omitted)]. Later, according to Plaintiff, Bobar indicated "on March 28, 2022, that he would be reviewing FEMSA's strategy to establish a national distribution platform and the FEMSA acquisition was further discussed between Bobar and Jansen during their Microsoft Teams meeting" [*Id.* (citation omitted)]. Plaintiff concludes that "the entirety of the negotiations and resulting contract between the parties was created pursuant to FEMSA's influence, strategy[,] and goals as the overarching owner of all other Defendants and inured to FEMSA's benefits" and therefore, "FEMSA played an active role in the wrongdoing against [it], is subject to this Court's jurisdiction, and should not be dismissed as a Defendant in this cause" [*Id.*].

Defendants reply that Plaintiff cannot rely on its allegations in the Complaint to contest Ferracane's Declaration and that Bobar's reference to FEMSA does not subject it to the Court's jurisdiction [Doc. 23 pp. 2–5].

The Court finds that it does not have personal jurisdiction over FEMSA. First, Plaintiff does not contend that the Court has general personal jurisdiction [*See id*. at 2 n.2]. FEMSA is incorporated in Mexico, which is also its principal place of business, and therefore, the Court concludes that general personal jurisdiction does not exist. *See Dochnal v. Thomson Reuters Corp.*, No. 2:18-CV-00044, 2018 WL 5045205, at *3 (E.D. Tenn. Oct. 17, 2018) (finding no general jurisdiction over a parent company incorporated in Ontario, Canada with its principal place of business in Toronto, Canada).

But the inquiry does not stop there. "Specific jurisdiction allows a defendant to be sued in the forum state where the issues of the suit derive from or are connected to the contacts that establish jurisdiction." *Id.* In order to exercise specific jurisdiction over a defendant, it must (1) "purposefully avail itself of the privilege of acting in the forum state or causing a consequence in the forum state[,]" (2) "the cause of action must arise from the defendant's activities" in the forum state, and (3) the defendant's acts or consequences thereof "must have a substantial connection with the forum state to make the exercise of jurisdiction over defendant reasonable." *Id.* (citing *S. Machine Co. v. Mohasco Indus. Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). All three prongs must be satisfied to exercise personal jurisdiction. *Id.* (citation omitted).

Plaintiff contends that jurisdiction exists because Bobar referenced in two emails that FEMSA's goal was to create a national distribution platform that benefitted Plaintiff. But the Court finds Bobar's references are not sufficient to establish specific jurisdiction over FEMSA. Plaintiff claims that Bobar was "acting as Defendants' duly authorized agent," [Doc. 22-1 p. 7], but there are no facts in the Complaint to support that Bobar was the agent for FEMSA. *See Bird v. Delacruz*, No. 04-CV-661, 2005 WL 1625303, at *4 (S.D. Ohio July 6, 2005) ("A number of federal district courts have held a complaint relying on agency must plead facts which, if proved,

could establish the existence of an agency relationship. It is insufficient to merely plead the legal conclusions of agency." (cleaned up) (collecting cases)).

And here, Defendants submitted Ferracane's Declaration, which states that Bobar is the Director of Purchasing for Southeastern and is not FEMSA's employee [Doc. 13-1 ¶ 21]. Further, FEMSA is not any other Defendants' direct, sole owner: Envoy owns Penn Jersey and Southeastern, and Emprex International LLC (FEMSA's subsidiary) owns Envoy [Doc. 13-1 ¶¶ 7–130]. Plaintiff has not rebutted this evidence. *See Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) ("In the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." (citation omitted)).

According to Defendants' unrebutted evidence, FEMSA is a Mexican holding company [*see* Doc. 13-1 ¶ 10], and it is not subject to jurisdiction based solely on the conduct of its subsidiaries. *See Taco Mamacita, LLC*, 2022 WL 16542580, at *9 (finding parent company did not purposefully avail itself of acting in Tennessee where the alleged Tennessee contacts were taken by the company's subsidiary); *Brown v. Quince Nursing & Rehab. Ctr., LLC*, No. 2:18-CV-2740, 2020 WL 4873670, at *7 (W.D. Tenn. Aug. 19, 2020) ("Deriving substantial revenue from a subsidiary that is subject to the jurisdiction of the court in the forum state, alone, is not enough for a court to have jurisdiction over that subsidiary's parent company." (citation omitted)); *Univ. of S. v. S. Univ., LLC*, No. 4:09-CV-71, 2009 WL 10675089, at *3 (E.D. Tenn. Nov. 20, 2009) ("[T]he personal jurisdiction of a subsidiary does not lead to automatic personal jurisdiction of a parent corporation unless there is evidence that the parent acts as an alter ego of the subsidiary.").

And as set forth in Ferracane's Declaration, FEMSA operates separately from its subsidiaries [Doc. 13-1 ¶¶ 16–20]. The Court therefore concludes that it does not have jurisdiction over FEMSA.[5]

### B.    Breach of Contract Claim

Defendants assert that Plaintiff's breach of contract claim fails because no one wrote that the agreement was to be a sole supplier agreement and that Plaintiff's "expectation that the alleged agreement would last for ten years has no basis in any statement, promise, or writing made by any individual or party to the Complaint" [Doc. 13 p. 11 (internal quotation marks omitted)]. First, Defendants contend that Plaintiff "makes no attempt to show that it has a written agreement to be FEMSA's, Envoy's, Southeastern's, or Penn Jersey's 'sole supplier' of paper goods—let alone for a ten-year period" [*Id*. at 12 (emphasis omitted)]. Citing to Tennessee's Uniform Commercial Code ("UCC"), Tenn. Code Ann. § 47-2-201, Defendants state that Plaintiff cannot enforce its purported ten-year, sole supplier agreement. Acknowledging that "the parties exchanged many emails negotiating price[,]" Defendants argue that Plaintiff "cannot point to any signed writing that contains the alleged quantity: all of the Defendants' requirements for paper goods for ten years" [*Id*. at 13 (emphasis omitted)]. According to Defendants, this is fatal to Plaintiff's claim because it cannot satisfy the UCC's Statute of Frauds.

Second, Defendants state that the contract did not satisfy the parties' condition of acceptance—namely, because Furia never signed a written agreement. At the beginning of

---

[5]    Defendants also moved to dismiss FEMSA because Plaintiff failed to state a claim of relief against it, arguing that "FEMSA made no statements, sent no emails, engaged in no conversations, partook in no negotiations, and made no promises. Not one individual named in the complaint is a FEMSA employee" and "FEMSA's logo appears nowhere in the exhibits" [Doc. 13 p. 11]. Relying on Bobar's references to FEMSA and its alleged goals, Plaintiff asserts that it has stated a claim against FEMSA [Doc. 22-1 p. 7]. Although Plaintiff concludes that "FEMSA played an active role in the wrongdoing against [it,]" [*see id*.] there are no allegations in the Complaint setting forth FEMSA's wrongdoing. Thus, even if the Court had jurisdiction over FEMSA, Plaintiff has not stated a claim against it. *See* Fed. R. Civ. P. 12(b)(6).

negotiations, according to Defendants, Bobar told Plaintiff to write the program to Furia, Bobar's boss, and that Furia would sign the program. Defendants argue, "Unambiguously, Bobar set out the terms for acceptance (a signed agreement with Furia), and Furia never signed a ten-year exclusivity agreement" [*Id*. at 16].

Third, Defendants contend that Plaintiff cannot rely on its purchase orders from Southeastern as evidence of an "unwritten exclusivity agreement with all of the Defendants" [*Id*. at 17]. Relying on the UCC, Defendants submit that "partial performance cannot remedy Statute of Frauds deficiencies beyond the goods delivered and paid for" [*Id*. (citation omitted)]. Defendants add that "the alleged oral statements and emails that occurred before and after Southeastern issued the purchase orders are not incorporated into the orders themselves, by operation of the UCC's parol evidence rule" [*Id*. (emphasis and citations omitted)].

Plaintiff responds that its "Complaint more than sufficiently satisfies the requirement to state a claim for breach of contract against the Defendants that is plausible on its face" [Doc. 22-1 p. 8]. Agreeing that this issue is governed under Article 2 of Tennessee's UCC, Tenn. Code Ann. § 47-2-101 *et seq*., Plaintiff states that Tenn. Code Ann. § 47-2-207(1) "expands formation of contracts for the sale of goods beyond a fully integrated written document" [Doc. 22-1 p. 9]. "In cases such as this one," Plaintiff argues, "where there is not a fully integrated written agreement although there is an agreed-upon pricing list and a course of conduct demonstrating an agreement, Tennessee law incorporates the UCC gap-filing provisions . . ." [*Id*. at 10 (citation omitted)]. Plaintiff states that dismissing this case because there is not a 'fully-integrated' document is inappropriate" [*Id*.]. Plaintiff responds that "at no time did [it] plead that there was a ten-year term contract and the Complaint should not be dismissed on that basis as Defendants suggest" [*Id*. at 13]. Instead, Plaintiff states that it pleaded its expectation that the parties' relationship would last

ten or more years [*Id.*].  Plaintiff outlines the elements of a breach of contract claim and cites to allegations, which it argues, supports each element [*Id.* at 11–15].

Defendants reply that Plaintiff cannot rely on Southeastern's purchase orders to establish that "all Defendants and [Plaintiff] struck the sole supplier agreement" [Doc. 23 p. 6 (emphasis omitted)].  Further, Defendants state that the statutes that Plaintiff relies on are inapplicable.  Defendants maintain that the UCC's Statute of Frauds requires a written agreement.  Because the parties did not sign an agreement for a sole supplier contract, they did not satisfy the condition of acceptance.  Further, Defendants contend that Plaintiff fails to explain how the parties' communications establish a sole supplier agreement.

Count I of the Complaint alleges that Defendants breached the parties' contract [Doc. 1-1 ¶¶ 74–84].  Paragraph 76 alleges, "The agreement was supported by adequate consideration and relied on promises in lieu of consideration, including, but not limited to, Plaintiff's purchasing of product to service Defendants' needs and Defendants' promise to Plaintiff that Plaintiff would be the sole supplier for Defendants" [*Id.* ¶ 76].  "Under Tennessee law, a plaintiff alleging breach of contract must prove (1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." *Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 823 F. Supp. 2d 786, 803 (W.D. Tenn. 2011) (citing *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship,* 79 F.3d 496, 514 (6th Cir. 1996)).  At the heart of the parties' dispute is whether Plaintiff plausibly alleged the existence of a contract.

The parties acknowledge that Tennessee's UCC applies.  Pursuant to Tennessee Code Annotated § 47-2-201(1):

> Except as otherwise provided in this section, a contract for sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing or record sufficient to indicate that a contract for sale has been made

16

between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing or record is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing or record.

Tenn. Code Ann. § 47-2-201(1). The comment to the statute explains that not all the material terms are required to be in the written agreement. Tenn. Code Ann. § 47-2-201(1) cmt. 1. But there are "three definite and invariable requirements[,]" including (1) "it must evidence a contract for the sale of goods;" (2) "it must be 'signed,' a word which includes any authentication which identifies the party to be charged;" and (3) "it must specify a quantity." Tenn. Code Ann. § 47-2-201(1) cmt. 1; *Cackowski v. Drake*, No. E202200700COAR3CV, 2023 WL 155124, at *6 (Tenn. Ct. App. Jan. 11, 2023) ("The 'three definite and invariable requirements' of this subsection are that the memorandum in question must evidence a contract for the sale of goods, must be signed, and must specify a quantity." (citation omitted)). "[T]he purpose of the UCC's statute of frauds [is] 'to ensure that the parties did in fact have an agreement.'" *W. Silver Recycling, Inc. v. ProTrade Steel Co., LTD.*, 476 F. Supp. 3d 667, 679, n.10 (M.D. Tenn. 2020) (quoting *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, No. 12-11045, 2012 WL 4356781, at *5 (E.D. Mich. Sept. 23, 2012)).

Plaintiff admits that there is not a fully integrated written agreement [*see* Doc. 22-1 p. 10 ("In cases such as this one, where there is not a fully integrated written agreement . . .")]. But a fully integrated written agreement is not necessarily required. "[T]he statute of frauds need not be satisfied by a single writing; multiple writings collectively can do the job." *W. Silver Recycling, Inc.*, 476 F. Supp. 3d at 679 n.10; *see also Garland v. Ford Motor Co*., No. 2:12-00121, 2013 WL 3937017, at *3 (M.D. Tenn. July 30, 2013) ("[T]to satisfy the statute of frauds, a party may rely on multiple documents evidencing the same transaction, provided that the writings on their face

17

relate to one another.") (quoting *Oliver v. Upton*, No. 01A01-9705-CH-00197, 1998 WL 151388 at *3 (Tenn. Ct. App. April 3, 1998)).  And these multiple writings do "not need to be formal or sophisticated documents."  *W. Silver Recycling, Inc.*, 476 F. Supp. 3d at 679 n.10 (citing *Waddle v. Elrod*, 367 S.W.3d 217, 222 (Tenn. 2012) (finding that the parties' various emails satisfied the statute of frauds) and *CALA Diamonds, LLC v. HRA Grp. Holdings*, No. 17-CV-1136, 2017 WL 4222886, at *12 (E.D. Pa. Sept. 22, 2017) (holding that "the invoices, emails, shipping and promotional materials which are alleged to have been exchanged between the parties[] are, we find, definite enough to reflect the terms of the parties' oral agreements and [d]o in and of themselves constitute a written contract.")).

Even so, the multiple writings must have a precise quantity term.  *Cackowski*, 2023 WL 155124, at *6 (explaining that the quantity term is a requirement).  Here, the Court finds that the parties' emails do not contain a precise quantity term.  When Bobar made the initial contact with Jansen, he told Jansen that he had been "tasked to engage suppliers and come up with an Envoy program for all members and drive sales to fewer partnered suppliers" [Doc. 1-1 p. 46], and shortly thereafter, he noted to Jansen the "need to create one Envoy program and create true value for our partnered vendors" [*Id.* p. 49].  Later, Bobar reiterated that the need was to "create one Envoy[,]" and "one program for all of Envoy and the price list for all of Envoy[,]" but he did not reference a sole supplier [*Id.* at 49, 53].  In a later email, Bobar noted that "[w]e are prepared to award the register roll business to [Plaintiff] for all of Envoy Solutions" [Doc. 1-1 p. 108].  And subsequently, Bobar committed "to giving [Plaintiff] all of the business today" [*Id.* at 116].  But the Court does not construe these statements, in light of the other emails, to mean "all of the Defendants' needs, of all kinds" [Doc. 13 p. 15].  Further, on August 1, 2022, Bobar told Anderson that he was going to check with another wholesaler, Essendant, on another item [Doc. 1-1 p. 140].  While the

undersigned has construed the allegations in the light most favorable to Plaintiff, the Court has reviewed the emails attached to the Complaint and finds that a required term is missing from these documents: quantity. Plaintiff therefore cannot satisfy the Statute of Frauds.[6]

Still, there are exceptions to the Statute of Frauds—one of which Plaintiff relies on. Specifically, Tennessee Code Annotated § 47-7-207(3) states, "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." In other words, under this statute:

> [P]erformance by both parties under what they apparently believe to be a contract may be sufficient to establish a contract, notwithstanding the fact that no contract would have been recognized on the basis of their writings alone. The rationale for such a rule is easy to apprehend. Sellers usually do not ship and Buyers do not receive goods unless they think they have struck a deal. Under such circumstances, the terms of the agreement between the parties are the terms on which the writings of the parties agree as well as the UCC's gap filling provisions.

*Carbon Processing & Reclamation, LLC*, 823 F. Supp. 2d at 804 (internal quotation marks and citations omitted).

Plaintiff points to Southeastern's purchase orders to support its allegations that it would be Defendants' sole supplier, stating that it began purchasing items under the parties' agreed-upon pricing terms. But the comment to Tennessee Code Annotated § 47-2-201 states that partial performance, in lieu of a contract, "can validate the contract only for the goods which have been accepted or for which payment has been made and accepted." Tenn. Code Ann. § 47-2-201 cmt. 2; *see also Aluminum Vinyl Sales Co. v. Woerz*, No. 03A01-9304-CV-00172, 1993 WL 367125, at *3 (Tenn. Ct. App. Sept. 20, 1993). Southeastern acknowledges that it issued purchase orders in

---

[6]    In light of this finding, the Court does not need to address Defendants' argument that the parties did not satisfy the condition of acceptance—that is, Furia did not sign the program [*See* Doc. 13 p. 16].

19

August and September 2022 [*See* Doc. 13 p. 17]. But as Plaintiff alleges in the Complaint, it and Southeastern had a business relationship prior to the parties' negotiations [Doc. 1-1 ¶¶ 14, 17]. In addition, there are no allegations that the purchase orders contain an exclusivity term [*See* Docs. 1-1 pp. 177–199]. The Court finds that the purchase orders do not evidence an exclusivity agreement.[7] In light of the above findings, the Court **DISMISSES** Plaintiff's breach of contract claim.

### C. Fraud-Based Claims

Counts II and III in the Complaint allege promissory fraud and intentional misrepresentation, respectively [Doc. 1-1 ¶¶ 85–89].[8] Defendants state that Plaintiff's "alleged representation deals with a future intent, not a present fact, which is fatal to the Fraud-Based Claims" [Doc. 13 p. 19]. In addition, Defendants state that Plaintiff does not plead promissory fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

#### 1. Intentional Misrepresentation

The parties agree that intentional misrepresentation has six elements: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

---

[7]    Further, as Defendants argue, the Court cannot consider any alleged oral statements that are not incorporated into the orders themselves pursuant to the parol evidence rule. Tenn. Code Ann. § 47-2-202; *Upperline Equip. Co. v. J & M, Inc.*, 724 F. Supp. 2d 883, 890 (E.D. Tenn. 2009) ("The alleged oral modification to the Purchase Agreement was not in writing and would be barred by the Statute of Frauds.").

[8]    Defendants point out that "'[i]ntentional misrepresentation,' 'fraud misrepresentation,' and 'fraud' are different names for the same cause of action" [Doc. 13 p. 19 (citing *Hodges v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012)].

20

*Iseman v. Werner*, No. 3:19-CV-365-TRM-DCP, 2020 WL 4674113, at *7 (E.D. Tenn. Aug. 12, 2020) (citing *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)).

Defendants assert that Plaintiff has not alleged the first element. Defendants contend that the only arguable basis for this claim is Plaintiff's allegation that it "would be the sole supplier of bond, thermal, and carbonless paper products for Southeastern and Penn Jersey in the course of their business" [Doc. 13 p. 20 (citations omitted)]. But in reviewing the context of the total negotiations, Defendants state that these "would be" representations "are forward-looking and do not concern an existing or past fact" [*Id.*]. According to Defendants, "Courts applying Tennessee law regularly reject efforts to cloak a 'promissory fraud' claim in 'intentional misrepresentation' garb" [*Id.* (citation omitted)].

Plaintiff states that it has sufficiently pleaded the first element of its intentional misrepresentation claim. Specifically, Plaintiff points to "Furia's representations to [it] that the parties had an agreement after Southeastern began ordering from [it] pursuant to the parties' newly agreed-upon pricing[,]" calling these representations "existing or past facts" [Doc. 22-1 p. 19 (internal quotation marks omitted)]. According to Plaintiff, this is sufficient "to draw the reasonable inference that Defendants did not intend to keep their promise for [Plaintiff] to be the sole supplier to Defendants when they made it" [*Id.*]. Stating that Southeastern began purchasing pursuant to the new pricing terms on August 8, 2022, Plaintiff states that a few days later, "Furia openly stated in a Microsoft Teams meeting that Defendants would move forward with [Plaintiff], that Southeastern's order would continue, and Penn Jersey's would begin in September 2022" [*Id.* (emphasis omitted)]. Plaintiff claims that when "Furia made the statement regarding Southeastern, the parties were already operating under the agreement" [*Id.*].

"Statements of future intention, opinion, or sales talk are generally not actionable because they do not involve representations of material past or present fact." *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (citing *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982)); *see also Frankot v. Reg'l Inst. for Veterinary Emergencies & Referrals*, No. 1:13-CV-27, 2013 WL 12192495, at *5 (E.D. Tenn. July 26, 2013) ("Courts applying Tennessee law recognize a defendant's promise to perform in the future implicates a promissory fraud claim and not an intentional misrepresentation claim."). Here, Plaintiff has pleaded its intentional misrepresentation claim in the context of forward-looking promises. In support of its argument, Plaintiff cites to paragraphs 56–57 of the Complaint, but there are no representations in these paragraphs [*See* Doc. 1-1 ¶¶ 56–57]. Plaintiff also cites to paragraphs 58–62, but most of these paragraphs simply refer to the parties' email exchanges regarding information requests [*See id.* at ¶¶ 58–62]. Paragraph 62 contains the following allegation: "Defendants' Furia ended the call by stating that Plaintiff's program for serving Defendants would move forward, that Defendant Southeastern's orders would continue, and that Plaintiff could anticipate orders from Defendant Penn Jersey beginning in September[] 2022" [*Id.* ¶ 62]. But these are all statements of future intention that do not relate to an existing or past fact but instead speak to Defendants' future conduct: a promise to continue orders and a promise for Penn Jersey to place orders.[9] This does not state a claim for intentional misrepresentation. *See Power & Tel. Supply Co.*, 447 F.3d at 931 (finding that the representations "involved generalized

---

[9]     Both parties recognize that while a promise of future intention is not actionable as an intentional misrepresentation claim, it can be actionable as a promissory fraud claim [*See* Doc. 13 p. 19 ("Promissory fraud shares these elements, except that the representation required by the first element is not one as to an existing or past fact . . ."); Doc. 22-1 p. 19 (requesting that promissory fraud claim go forward should the Court dismiss the intentional misrepresentation claim); Doc. 23 p. 13 (noting that there is an exception to the requirement that fraud requires a representation of past or present fact, but the exception is the doctrine of promissory fraud).

sales talk and not representations of existing or past fact" and therefore did not constitute an intentional misrepresentation claim); *Frankot*, 2013 WL 12192495, at *5 (the defendant's "alleged promise to provide access or . . . alleged promises to serve as [the p]laintiff's mentor are not representations of existing fact").

### 2. Promissory Fraud Claim

Defendants contend that Plaintiff does not adequately plead its promissory fraud claim pursuant to Rule 9(b). Arguing that Plaintiff engages in "group pleading," Defendants state that Rule 9 does not allow that form of pleading. Defendants contend that Plaintiff has attached numerous emails and quotes them in the Complaint, but "none of the emails . . . contains the supposed promise on which [Plaintiff's] fraud claims are based—namely, that [Plaintiff] would be the sole and exclusive supplier of bond, thermal, and carbonless paper products for all Defendants" [Doc. 13 p. 21]. Further, Defendants argue that Plaintiff does not attribute any specific promise to one Defendant, which is fatal to its claim. Defendants add that "it is not enough for [Plaintiff] to identify an alleged parent, subsidiary, or sister relationship between the various Defendants to overcome the lack of particularized allegations" [*Id*. at 22 (citation omitted)]. Defendants summarize that Plaintiff "does not identify with sufficient particularity which of the four Defendants—Envoy, Southeastern, Penn Jersey, or FEMSA—made the alleged misrepresentation upon which its promissory fraud claim is based[,]" thus, failing to meet Rule 9(b)'s requirements [*Id*.].

Plaintiff responds that Defendants' position is incorrect and that "the manner in which it [pleaded] its allegations regarding fraud and/or misrepresentation against the Defendants was sufficient to put [them] on notice of its claims such that dismissal pursuant to F.R.C.P. Rule 12(b)(6) is inappropriate" [Doc. 22-1 p. 16]. Here, Plaintiff argues, that it made "specific

23

allegations that Defendants made representations to [it] on multiple occasions that it would be the sole supplier for Defendants, negotiated a pricing plan for Defendants, began to perform under the pricing plan, and did so without present intention to fully perform" [*Id.* at 20 (citation omitted)]. Referencing Defendants in a group, Plaintiff contends, "is not fatal to [its] promissory fraud claim" [*Id.*].

In addition, Plaintiff argues that it identifies "Bobar and Furia[] as the makers of the fraudulent statements on behalf of Defendants and sets forth those statements in terms of time, place, and content" [Doc. 22-1 p. 20]. Throughout its Complaint, Plaintiff states that it alleges Defendants' misrepresentations and fraudulent statements, upon which it reasonably relied, and that it "bought products in order to ensure Defendants' needs were adequately supplied pursuant to the agreement, adding Penn Jersey to its insurance and providing proof of such, exchanging tax information and credit references with Defendants, and fulfilling orders placed by Southeastern pursuant to the newly agreed-upon pricing program" [*Id.* at 21 (citation omitted)]. Plaintiff states that its "Complaint also sets up the fraudulent scheme of the Defendants, which was to negotiate the terms with [it], drive [it] to rely on the agreement to its detriment causing [it] to expend time, efforts, and money, doing so without intent to fully perform and subsequently unilaterally terminating the agreement to use another company, Iconex" [*Id.* (citation omitted)]. Without the benefit of discovery, according to Plaintiff, it "has been unable to determine whether Defendants utilized its agreement with [it] in order to benefit itself with Iconex" [*Id.*].

Defendants reply that while Plaintiff claims to identify Bobar and Furia as the individuals who made the fraudulent statements, the cited paragraphs and underlying documents do not contain statements from them [Doc. 23 pp. 13–15]. Defendants maintain that Plaintiff cannot engage in group pleading under Rule 9.

Pleading fraud is subject to a heightened pleading standard. Fed. R. Civ. P. 9(b). Specifically, a plaintiff who alleges fraud or mistake, "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that the party must allege "the time, place, and content of the alleged misrepresentation on which he or she relied." *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 509 (6th Cir. 2007) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 643 (6th Cir. 2003)). "In other words, a plaintiff must (1) specify the allegedly fraudulent statements, (2) identify the speaker, (3) plead when and where the statements were made, and (4) explain what made the statements fraudulent." *Gordon v. B. Braun Med. Inc.*, No. 1:19-CV-121, 2020 WL 1491378, at *10 (S.D. Ohio Mar. 27, 2020) (citing *Republic Bank & Trust Co. v. Bear Sterns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012)).

The purpose of this heightened pleading standard is two-fold: (1) "to put defendants on notice of the alleged misconduct," and (2) "to prevent fishing expeditions and to narrow potentially wide-ranging discovery to relevant matters." *Republic Bank & Tr. Co.*, 683 F.3d at 255 (internal quotation marks and citation omitted). Despite this heightened pleading standard, however, Rule 9 "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503–04 (6th Cir. 2008) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 678 (6th Cir. 1988)).

Count II of the Complaint relates to Plaintiff's claim for promissory fraud [Doc. 1-1 ¶ 85–87]. In paragraphs 86 and 87, Plaintiff references "Defendants" collectively. "Courts generally frown upon 'group pleading.'" *Gordon*, 2020 WL 1491378, at *11 (quoting *Kurek v. Ohio Dep't*

*of Dev. Disabilities*, No. 3:16cv623, 2017 WL 1555930, at *6 (N.D. Ohio Jan. 20, 2017)). Even so, the Court finds that the Complaint provides Defendants notice so that they can adequately respond. *See Newberry v. Serv. Experts Heating & Air Conditioning, LLC*, 806 F. App'x 348, 362 (6th Cir. 2020) ("Thus, while a plaintiff's complaint that refers only to 'defendants' is insufficient under Rule 9(b), a complaint that identifies a particular corporate defendant as well as the time, place, and content of the alleged misrepresentation need not also identify the corporation's individual employee who made the alleged fraudulent misrepresentation") (cleaned up). Beginning with paragraph 21, the Complaint details the parties' negotiations and specifically identifies Bobar and Furia as the primary individuals who took part in these discussions [Doc. 1-1 ¶¶ 21–70]. The Complaint outlines the date of each communication, the substance thereof, and attaches those communications as exhibits [*See* Doc. 1-1]. And, in paragraph 62, Plaintiff alleges that on August 12, 2022, during a virtual Teams meeting, "Defendants' Furia ended the call by stating that Plaintiff's program for servicing Defendants would move forward, that Defendant Southeastern's orders would continue, and that Plaintiff could anticipate orders from Defendant Penn Jersey beginning in September[] 2022" [*Id.* ¶ 62]. The allegations in the Complaint detail the who, what, when, where, and how. *Cf. BlueCross Blueshield of Tenn. v. Dunwoody Labs, Inc.*, No. 1:20-CV-167, 2021 WL 6275265, at *4 (E.D. Tenn. Dec. 8, 2021) ("Progressive, however, does not specify who made the misrepresentation, and whether they were employed by the County or the Hospital. It simply alleges that 'Decatur'—a term Progressive uses to refer to the Hospital and the County collectively—made these representations." (internal citation omitted)); *Heartland Payment Sys., Inc. v. Hickory Mist Luxury Cabin Rentals, LLC*, No. 3:11-CV-350, 2011 WL 6122371, at *5 (E.D. Tenn. Dec. 8, 2011) ("Plaintiff's allegations fail to include any particularized facts with respect to the who, the what, the when, the where, and the how regarding the alleged

fraudulent conduct. There is no allegation regarding the time or place in which the fraudulent representations or transfers were made.").

Defendants contend that Plaintiff "does not identify with sufficient particularity which of the four Defendants—Envoy, Southeastern, Penn Jersey, or FEMSA—made the alleged representation upon which its promissory fraud claim is based" [Doc. 13 p. 22].[10] But similar to the above reasoning, Plaintiff identifies the two individuals who allegedly made the false promises—Bobar and Furia. *Cf. Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992) ("The complaint identifies relationships between various of the defendants but it alleges misrepresentations without sufficiently identifying which defendants made them. The complaint does not enable a particular defendant to determine with what it is charged."); *Constr. Mgmt., Inc. v. Expo Hosp., LLC*, No. 3:19-CV-00298, 2020 WL 489461, at *4 (M.D. Tenn. Jan. 30, 2020) (dismissing the fraud allegations against one defendant because the plaintiff resorted to group pleading and there were "no corresponding allegations of false statements made" by the defendant to the plaintiff). Additionally, the Complaint sets forth these individuals' role with the company Defendants [*See* Doc. 1-1 ¶¶ 20–21, 28, & 30]. The Court concludes that these allegations sufficiently state a claim for promissory fraud.

### D. Promissory Estoppel Claim

Defendants assert three reasons in support of their argument that the Court should dismiss Plaintiff's promissory estoppel claim. First, Defendants state that Plaintiff "relies on the same impermissible group pleading that forms the basis for its Fraud-Based Claims[,]" citing its arguments outlined above [Doc. 13 p. 23]. Second, Defendants argue that the alleged promise is

---

[10] Given that the Court lacks jurisdiction over FEMSA, *see supra* pp. 10–14, the Court will not address this argument as it relates to that entity.

too indefinite to be enforced because it did not have a specific term. Third, Defendants argue that Plaintiff's actions in relying on the alleged promise were not objectively reasonable.

The Court has already determined that the Complaint complies with Rule 9(b), and therefore, the Court will not re-visit this issue. Instead, the Court will turn to Defendants' remaining arguments.

Defendants assert that Tennessee limits the doctrine of promissory estoppel to "exceptional cases" [Doc. 13 p. 23 (citation omitted)]. Arguing that this is not an exceptional case, Defendants state that the promise must be "sufficiently definite" [*Id*. at 24]. According to Defendants, "Tennessee courts routinely find that promises without a definite length (such as a one-year or multi-year duration) are too vague to be enforceable" [*Id*.]. Defendants state that this "is consistent with their application of the Statute of Frauds, which requires contracts with lengths of one year or more to be in writing" [*Id*.]. While Plaintiff states that it expected the parties' relationship to last ten or more years, Defendants argue that it does not allege they promised a particular term. Defendants state, "The Court should not allow [Plaintiff] to avoid the Statute of Frauds by enforcing a 'sole supplier' agreement (based on an alleged oral statement) with a ten-year term (created by [Plaintiff's] 'expectation')" [*Id*.].

Further, Defendants state that Plaintiff's "alleged reliance on an oral promise was objectively unreasonable" [*Id*. at 25]. Pointing to Bobar's statement at the beginning of the negotiations that "Furia would sign the final agreement[,]" Defendants assert that Plaintiff acted unreasonably because it was aware the parties needed a signed agreement [*Id*. (citation omitted)]. Defendants submit:

> And, purchasing materials in *anticipation of* product it hoped Penn Jersey might order is not reasonable: (1) Penn Jersey never told Monaco it was ready to issue orders; (2) Penn Jersey never sent Monaco any purchase orders at all; (3) the email communications

28

between Monaco and Bobar were not consistent with an exclusivity agreement with Penn Jersey (or Southeastern, or the other Defendants); and (4) the parties never discussed the length of the agreement.

[*Id.*].

Plaintiff responds that it has alleged an exceptional case, "wherein the doctrine of promissory estoppel should be applied and the Statute of Frauds is inapplicable" [Doc. 22-1 p. 23]. According to the allegations in the Complaint, Plaintiff asserts, Bobar and Furia promised that Plaintiff would be the sole supplier, inducing Plaintiff "to act to its detriment" [*Id.* (citations omitted)]. In addition, Plaintiff argues that "[b]ased on its course of dealings with Southeastern, the [Plaintiff's] pricing offer to Defendants was for a definite one-year term (August 1, 2022, through July 31, 2023) that [Plaintiff] reasonably anticipated would roll over from year to year" [*Id.* (citations omitted)]. Plaintiff submits that it adjusted its pricing so the parties could "close the deal" and that it "relied on Furia's statement that Defendants would move forward with [Plaintiff] and to expect forthcoming orders from Southeastern and Penn Jersey" [*Id.* (citations omitted)]. Plaintiff submits that the parties agreed in writing to a "one-year term portion for the pricing . . . which was never altered by Defendants in subsequent negotiations" [*Id.* at 24 (citations omitted)].

Citing to the actions it took based on Defendants' alleged promises, Plaintiff alleges that it suffered an economic detriment that was reasonably foreseeable [*Id.*]. Plaintiff argues that Defendants told it to expect additional sales, they requested additional products, and Southeastern purchased items at the agreed-upon pricing program [*Id.*]. With respect to Defendants' argument that Bobar stated that Furia needed to sign the program, Plaintiff states that such ignores Bobar's later statements that Defendants would move forward with Plaintiff, and they began to perform using the agreed-upon pricing program [*Id.* at 24–25]. Arguing that Bobar and Furia told Plaintiff to expect orders, Plaintiff states that it reasonably relied on those statements to purchase additional

products and to take further actions (i.e., adding Penn Jersey to its insurance) [*Id.* at 25]. Plaintiff states that the application of promissory estoppel is warranted in this case.

With respect to Plaintiff's argument regarding the one-year pricing list, Defendants reply that "[a] promise with a yearly length that rolls over indefinitely is the same as a promise with an indefinite length" and is not enforceable [Doc. 23 p. 16]. Defendants disagree that this is an exceptional case. Defendants dispute there was a partial performance of the alleged agreement, stating that "the Southeastern purchase orders were their own, separate, fully integrated written contracts containing no exclusivity agreement" [*Id.*].

Promissory estoppel is "a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982). "[A] plaintiff[] may invoke the theory of promissory estoppel, even though contracts for the sale of goods would ordinarily be governed by Article 2 of the [UCC]." *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991) (citation omitted); *see also Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 405 (Tenn. Ct. App. 2007) ("A claim of promissory estoppel is not dependent upon the existence of an express contract between the parties." (citation omitted)). As the Tennessee Court of Appeals has explained, "The key element in finding promissory estoppel is, of course, the promise. It is the key because the court must know what induced the plaintiff's action or forbearance; only then would the court be able to prevent the injustice resulting from a failure to keep the promise." *Amacher*, 826 S.W.2d at 482.

To state a claim for promissory estoppel, plaintiffs must allege "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they

reasonably relied upon the promise to their detriment." *Chavez*, 245 S.W.3d at 404 (citation omitted). It is a "equitable doctrine, and its limits are defined by equity and reason." *Id.* (citation omitted). "Tennessee does not liberally apply the doctrine of promissory estoppel. To the contrary, it limits application of the doctrine to exceptional cases." *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citing *Shedd v. Gaylord Entertainment Co.,* 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003)); *see also Johnson v. Allison*, No. M2003-00428-COA-R3CV, 2004 WL 2266796, at *8 (Tenn. Ct. App. Oct. 7, 2004) ("Since the application of promissory estoppel in contract cases creates an exception to the Statute of Frauds, it should not be applied too liberally lest the exception swallow the rule.").

As explained above, at the motion to dismiss stage, the Court must construe the pleadings in favor of Plaintiff. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). In so construing, the Court will allow this claim to proceed. According to the exhibits attached to the Complaint, Bobar stated that he was "looking for one program for all of Envoy and one price list for all of Envoy" [Doc. 1-1 p. 53]. Later, Bobar stated, "We are prepared to move forward with [Plaintiff]" and that would be his suggestion to his boss, Furia [*Id.* at 108]. He mentioned that Bobar is also ready to move forward if Jansen could address some issues [*Id.*]. On July 21, 2022, Plaintiff offered "this program" to Envoy from August 1, 2022, to July 31, 2023 [*Id.* at 112]. Bobar responded, "I think this is going to be a great relationship[,]" and he requested a revised price list [*Id.* at 115]. Bobar later requested a pricing adjustment, believing that if Plaintiff agreed, it would "close the deal and [they] can move forward" [*Id.* at 116]. Bobar concluded, "Please let me know if you can make this adjustment[,] and I will commit to giving you all the business today" [*Id.*]. Plaintiff responded, "[L]ets move forward with your proposal [*Id.*]. In another email, dated July 26, 2022, Bobar stated he was planning to "announce this to the sales team on Monday 08/01/22.

We are very excited to move forward and really partner with [Plaintiff]" [*Id*. at 124]. The parties later exchanged information for shipping, and according to the allegations in the Complaint, Furia told Plaintiff during a virtual meeting that Plaintiff's program would move forward [*Id*. ¶ 62]. Southeastern then began making purchase orders "under the new pricing program created for the Defendants and agreed upon by the parties" [*Id*. ¶ 65].

Defendants argue that any alleged promise was not sufficiently definite in length. But Plaintiff's letter states that the program would be in effect from August 1, 2022, to July 31, 2023 [*Id*. at 112]. And, after receiving a pricing adjustment, Bobar responded, "I think this is going to be a great relationship" [*Id*. at 115]. The parties also dispute whether Plaintiff reasonably relied on the alleged promise. Defendants argue that Furia needed to sign the program as noted at the beginning of their negotiations. Plaintiff alleges that during the parties' virtual meeting, Furia stated that Plaintiff's program would move forward and that the parties worked together to start the placement of orders [*Id*. ¶¶ 46–61]. Defendants also argue that Plaintiff's anticipation of product from Penn Jersey was not reasonable. The Complaint, however, alleges that on August 1, 2022, Caroline Bane, Senior Category Analyst for Defendant Envoy, requested that Plaintiff complete the new vendor information for Defendant Penn Jersey; on August 9, 2022, Bobar requested information from Plaintiff so Penn Jersey could set up product codes; and on August 12, 2022, Furia told Plaintiff that it could anticipate receiving Penn Jersey's orders in September 2022 [*Id*. ¶ 50, 61, & 62]. In construing the allegations in favor of Plaintiff, the Court finds that at this stage, Plaintiff reasonably relied on the above emails to prepare orders for Defendants. The Court declines to dismiss Plaintiff's promissory estoppel claim at this time.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Consolidated Motions to Dismiss [**Doc. 12**].  Specifically, the Court **DISMISSES** FEMSA from this matter.  The Court also **DISMISSES** Plaintiff's breach of contract claim and its claim for intentional misrepresentation.  The Court finds Plaintiff's remaining claims for promissory fraud and promissory estoppel shall proceed against the remaining Defendants.

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge